Appeal Challenges Mr. Vartanian's Two Convictions for Filing a False Tax Return as well as his two convictions for making a false statement on a credit application. I'd like to focus here on our central claims in challenging those four convictions. The first deals with the wrongful dismissal of a juror for misconduct. And if we prevail on that claim, it would obviously invalidate all four convictions. It looks like the juror went out of her way to make friends with the defendant's family and offer them some emotional support and reassurance, and contact them despite the judge's express, plain instruction not to contact them. Why isn't that enough? The key and central reason why that's not enough is because the juror did not violate any such admonition. We've identified in our briefing Didn't the judge tell the jurors don't contact or have any contact with anybody who's involved in this trial, the parties, the lawyers, the witnesses? No, Your Honor. What the court said, first of all, there was a juror videotape wherein something like that was stated to the jurors before the jury was sworn. What the court told jurors again and again and again was don't have any discussions with anybody about the case, about the case. When juror number seven then told them it'll come out all right, could that be interpreted as an indication of how the case is going to come out? Well, Your Honor, I don't think it supports the trial court's ruling for this reason. When she was initially questioned, when juror seven was initially questioned about her having said that, or about rather what her contacts were, what she said, she was up front with the trial court. You may feel as an advocate she was up front, but the district judge drew adverse feelings, did not believe her, that she was hedging. So I'm not sure how far you get on his, but my question is, if she says it'll come out all right, couldn't the district judge interpret that as a comment on the case? And therefore, she was discussing the case as she was instructed not to do. I don't think, well, I don't think reasonably he could interpret it that way, Your Honor. And I think certainly as well that a reasonable juror could certainly interpret it as the juror did. In other words, this wouldn't be a willful violation if the juror understood that to mean don't get into the merits of the case. And yet the court found she was willfully and intentionally violating his instructions. So what the court found was that she, in fact, did discuss the case. Now, you've got to remember that the district judge has got to decide whether he believes her or doesn't believe her. But just taking the face of it, it'll come out okay, could not, it would be, would it be clearly erroneous for the district judge to determine as a matter of fact that she was commenting upon the case? Your Honor, I think, I think for the reasons we've stated, it would. And here's one significant point that I think we should focus on. When Juror 7 describes what she said to the other jurors, she says, I tell them it's going to be all right. And she says, that's a, that's not a statement on the case, Your Honor, da, da, da. The trial court says, okay. And what's his reaction to that? I'm not going to dismiss Juror 7. He goes on then to hear about other contacts. And it's not, it's not the substance of what she said, she said. And that is very obvious, not only in his discussions with the other jurors, but when he makes his findings. He's interpret, he is interpreting, and he says so, that what he found to be a violation was her having violated the admonition to have discussions about the case. And it wasn't something that troubled the judge. And he didn't appear to believe that her having given reassurances was a contact of that kind. Because when he heard about it initially, he said, that doesn't bother me. He didn't have the whole case before him at the time. Well, Your Honor, that, that, that may be. I'm just addressing your point about, about what significance the judge apparently gave to that. So, but we look now as to whether or not this was an abuse of discretion for the judge to dismiss. And the judge made factual findings. And we will look in the record and see if they're clearly erroneous. That, that's, that is the that finding particularly, but on a host of other findings, that the district court was founding his ruling that she committed prejudicial misconduct on a fundamental misunderstanding of the facts. And it's reflected in his entire colloquy with the jurors. If I, and if I understand your argument correctly, it's based upon the idea that, that, that the juror never discussed the case, and that was what she was told to do by the court. The court always in his admonition do not discuss this case. So, therefore, it was all right if she could discuss anything she wanted to, time after time with the parties, as long as she didn't discuss the case. That's your argument. That's correct, Your Honor, unless and until the court gave an admonition that said, don't contact anybody at all. And he never did. And. But a more, maybe in a more. Videotape doesn't count? Well, Your Honor, as to videotape, I think any reasonable juror would understand if you're shown a videotape and you go into a courtroom and the court says, here, here are my admonitions, any reasonable juror would understand that to supersede anything that was on a videotape. I don't understand why. I, I, I would have thought if I've actually been in that situation, and when we watched the videotape in the jury assembly room, that was general instructions for all of us, and then the judge gave us more. I, I don't see why I would think that the one supersedes the other as opposed to the other. This goes to the element of her intentional violation of court admonitions, which the court relied on court admonitions. Any reasonable juror could understand that. That's not an, that's not an irrational I remember we got, there were three. There was the videotape in the jury assembly room, and then we came into the courtroom and the judge gave us more instructions, and then I got bounced, but the people that got selected got more instructions. And then they got more instructions at the end of the trial. Well, there was. Dunham said this supersedes what you got before. Well, essentially, Your Honor, the, the one instruction that was given at Wardeer throughout trial again and again and again by the court was one that talked about context about the case. And it was that admonition that the court relied on. He wasn't, he, he did bring out the videotape at the end and put it, made it part of the record. But what he, but what in his, his statements and his oral findings earlier on, he says, I can't believe that this juror violated my admonitions given over and over and over again. And if you look at each and every one of those admonitions, you'll see that it's what, what he's talking about is discussions concerning the case. But I'd like to, to, to segue, if I could, into, into the other great problem with what the trial court did, isn't that, that is the court's failure to apply Symington. I mean, it's one thing for a court to, to have heard allegations of misconduct and to begin to investigate them, as the court in this instance did. But what happened after that, the hearing on misconduct commenced was that the jury, the jury foreperson, of course, is the first one who comes in and tells the jurors about what, what the concern was. He says other jurors have seen, jurors have been making contacts with, you know, other people. I haven't seen them, but these other jurors have. We thought we'd bring that to your attention. And my concern here, by the way, is that is having an open mind part of, a proper part of deliberations? Is that something that jurors require to have, an open mind? Because we did a mock survey yesterday and the court cuts them off immediately. Don't get into the merits. I don't want to hear about that. That's not what I'm asking. A couple of jurors later, Sally P. comes in. And she says, she was the one that was, was apparently the one who, who had the discussion with the foreperson that led to the forepersons coming in. Sally P. says to the court, I, I, she, she talks about the contacts that juror seven had, but then proceeds to talk about, you know, Your Honor, yesterday, when deliberations commenced, we did a mock survey and, and juror seven said she, she's made up her mind. And she's not going to change her mind. And I just want to say, and the defendant's not guilty. So she gives away, she blurts out the position that the jurors have. She's the one juror who's a holdout. Now under Symington, Symington says that, that, that as soon as there is a, well, it says that a dismissal is improper if the evidence shows a reasonable possibility that the juror's view of the merits applies the impetus for removal. I mean, the government says it's only misconduct, but what we have here is evidence that had gotten in front of the court that the impetus for the removal, the reason the jurors came to the court and complained about juror seven was because she was a holdout. They didn't like her view on the merits. What did the district court say when you cited Symington to him and made this argument? He said, Your Honor, I'm, I'm, I think he, what he emphasized was the misconduct. And he thought, and certainly in his statements throughout, at the time of the findings was Symington didn't permit me to get into any of that. What Symington does is it precludes an inquiry to where, where the jurors stand on the merits. And, in fact, Symington does precisely the opposite. It compels the court to take notice of such evidence, however it comes out, advertently, inadvertently, invited, not invited. Once that's in front of the court, he's got two options. I, I don't know about that. You're, you're reading it as though a juror can engage in blatant misconduct. Suppose a juror solicited money from the defendant's mother and said, you give me $100, I'll vote not guilty. And the juror also told other jurors, I'm voting not guilty. And then one of the other jurors complained to the judge, she won't deliberate. She just says she's voting not guilty no matter what. Your view is that under Symington, that disclosure of her position in the jury room poisons any decision by the trial judge to dismiss the juror. But as I read Symington, it doesn't. As I read Symington, the judge can't dismiss the juror because she's holding out for not guilty, but can for objective, outside-the-jury-room misconduct, whether he knows her position or not. Well, I'm not sure Symington actually said that, but I'll concede, Your Honor, that if, if the, if what the court finds is that the complaint about whatever it is, in Symington the complaint was, this juror's incoherent. We can't follow her. We're trying to get a straight answer out of her, and she keeps saying that, that, you know, she's sticking to her position. Actually didn't disclose what that position was. It was fairly clear she was holding out for the defendant. Symington says the district court's discretion in this area is not unbounded. However, indeed, a court may not dismiss a jury during deliberations if the request for discharge stems from doubts about the juror, harbors about sufficiency of the evidence. Yes, Your Honor. The kinds of statements we have disclosed by the jurors in this case are almost identical to those disclosed in, in Symington as to what the position on the case was. In other words, the, what the, the jurors kept interjecting in, in the Symington inquiry was, we think we're going to have a hung jury. We don't want to have a hung jury. We don't want, we don't want there to be a holdout. I'm not sure they said holdout. We don't want a hung jury, repeatedly. And that's what gave the court notice that, that, that may lay, may have lain at the, at the bottom of all these complaints. And as to, to your question, Justice, Judge Kleinfeld, I, I think that, you know, I don't think Symington addresses the kind of, of situation you're talking about. I just frankly think that's Okay. Why don't you address it? How would it, how would it come out under a proper application of Symington? A proper application of Symington would inquire whether, first of all, the, the complaint that was made about a specific juror was pretextual, whether it shielded or was a, a proxy for what, in fact, was a, a, an opposition to one juror's view on the merits. Let, let, let's get concrete. Could the judge dismiss the juror in my hypothetical because she solicited a bribe in exchange for a not guilty verdict, even though the way the juror or the way the judge was led to knowledge of this was by jurors complaining that she wouldn't deliberate and was sure. Because the, the, the soliciting a bribe, a bribe would have had nothing to do with the juror complaints. But it did have something to do with them. It's why she was abdurately refusing to deliberate and holding out for not guilty. Well, but it's all, it's, it's extraneous misconduct for an entirely independent reason. There's not to be any contact with anybody outside the court about, I mean, taking a bribe is jury tampering, and certainly that would, would excuse the court from doing so. But it's not a proxy for, really, for, for the complaint in the first place, having been, we don't like what her views on the merits are. Would you handle footnote six in Symington, which seems to foreclose your argument? Let me just get that, Your Honor. Cases subject to this rule we emphasize are infrequent. In general, questions of juror bias or competence focus on some event or relationship between a juror and a party that is both easily identifiable and subject to investigation and findings without any intrusion on the delivery process. Isn't that what we have here? No, Your Honor. What we have here is an inquiry that, that is quite properly begun by the judge as an, as a, focusing on juror misconduct. And, and there isn't any intrusion into jury deliberations. But he can exclude that. He, he can, he can focus upon relationship between a juror and a party, and Symington will not interfere. He, he doesn't need to get the Symington issue if he's going to exclude for this reason. I, I think, Judge, Your Honor, if, if, if he is pursuing the, the, if the misconduct inquiry is spurred by a view on the merits as it was here. It doesn't say spurred by. It was the impetus for. If view on the merits is the impetus for the complaint. That's a different situation than where the misconduct is untainted by. You think what matters is not what the misconduct is. You think what matters is what started the judge looking into it. I came to the judge. I think it's, it's really whether, whether the misconduct is something that, that wouldn't, would not have been brought to the court's attention or might not have been brought to the court's attention but for the juror's view on the merits. There's nothing in Symington. Is the judge already making a, an inquiry into the juror's motivation for, for ratting out another member of the panel? Once that, once that surfaces as it did here, yes, Your Honor. Even though the judge then has conducted a full inquiry and, and a careful inquiry into misconduct by the juror that's been identified? Yes. And, and again on that point, we've talked about whether it was factually supported or not, but we're on a different point now. Yes, Your Honor, that's absolutely the case. Here's how Symington put it. This is paraphrasing Simon, Symington. If Juror 7 had agreed with the other jurors on the merits, they likely would never have complained about her ability to, to deliberate. So here, you have an analogous situation here. They would never, and, and interestingly, this complaint about Juror 7 only surfaces after deliberations have begun and after the other jurors realize what her position on the merits is. She's holding out for Mr. Partanian. And it's only then, even though many of these, almost all of these contacts are, supposedly happened before, never brought to anybody's attention. Nobody, the, the court had authorized communications from jurors by way of note. Nobody ever brought this misconduct to the court's attention. It was only when she stated her, her view on the merits that they suddenly said, hey, we've got a problem. And that's why I think a, a further inquiry under Symington was mandated here. And the judge did precisely the wrong thing by saying, I'm not going to do any of that. I'd like to move very quickly to my last claim, Your Honor, because I think it's also important. That's the, the claim on, on plain error. It's, it's. In, in Symington, I can't remember right now. Did the juror do anything wrong in that case other than just folding her arms and refusing to participate in the give and take? Well, if, if a juror really isn't, is, is, is absolutely incompetent, that's not morally wrong, but it's, it's a, it's wrong in the context of what would suffice for a jury dismissal. So yes, the. I understand that. Well, I just mean. If a juror, you said, you used the word incompetent. Let me hypothesize a juror who's really stupid, but gets through Vardir and they're on the jury. I didn't think there, that was any reason to dismiss the juror. Your Honor, if a, if a person is not capable of deliberating at all because, for a medical reason, for a, a, a dementia that they're, they're seized by some kind of dementia, I don't think there'd be any question that the court could dismiss at such a juror. Really? If somebody was, was, absolutely couldn't function and couldn't talk and went into a catatonic state, absolutely. Person who's a little nuts, goes into the jury room, has all kinds of crazy conspiracy theories. I'm talking about unable to, to function, completely, medically. In Symington, I don't remember the juror doing something outside the jury room that was bad, like the juror did in this case. That's true. But the juror in this case didn't, Your Honor. That's it. Didn't she chase some female relative of the defendant down the street just to give her emotional assurance? It could be, it could be taken when she says things will be okay. Just the way you tell somebody who's sick, don't worry, things will be okay. But it could also be she's disclosing how the jury is going or how she thinks it'll go. Well, again, Your Honor, I, what I can say is that when the ju, the juror seven described having said precisely that thing to somebody connected to the family when he was, when she was interviewed, and the judge said, you know what, in, in light of that, I'm not going to dismiss this juror. So that didn't, did not disturb the court. He didn't take it that way. What bothered him. So if I, the first time, when he hears the one little thing, he takes it as just the kind of gentle reassurance that people say to be nice. But then when he hears more, he thinks, this juror's a real loose cannon. She just can't stay away from the defendant's people. Again, Your Honor, it's, it's not, nobody reports anything other than, than, than a statement that it's going to be all right. She was perfectly up front about that. And it, what, her, the problem with this juror was that she was unrestrainedly gregarious. She, she. Some other jurors are talking to the defendant's people? As to, as well as to, yes. As well as to the prosecutors, prosecution witnesses, court personnel. She brings in, you know, these chocolates to the court personnel, something that the court cites as another, notes in passing that, that it was strange behavior. It may be strange. She may be over the top in terms of this kind of unrestrained friendliness, but it doesn't make her, doesn't supply a proper basis for dismissal. Thank you, counsel. Good morning. Mark Cullors, Assistant United States Attorney out of Fresno, California. I was one of the trial counsel on the case. First of all, I gotta correct the record. There's absolutely no evidence that this juror number seven talked to the prosecutors or anybody else. She was gregarious. That was my first question, actually. Gregarious to one side and one side only. She didn't talk to the prosecutors and. She didn't talk to the prosecutors. She didn't talk to any of the agents in this case. She didn't talk to anybody but the defendants and the defendant's family. That was, and that is what the record reveals in this case. So she wasn't just a chatty catty. She was. Not a chatty catty. Friends with her defense attorney. No doubt she, she was gregarious. There is some evidence that she was, that she was friendly with court personnel. Right? She should bring some chocolates. She was friendly to the court reporter. And, but she was selective in her gregariousness. So I think that needs to be cleared up right away. And I think secondly, this court needs to understand that the impetus for this juror for the note from the foreperson had nothing to do with the juror's marriage. You have to remember, this took place on the morning of the first day of the deliberations. The jury had just started to deliberate. And that morning, that juror walks into the courthouse, approaches the magnetometer, sees the defendant's family sitting outside the courtroom. Although she's walking with the rest of the jurors, she makes a point to turn around, go back outside the courtroom, go to the defendant's parents and the girlfriend of the defendant's brother, talk to them, and then come back in the courtroom. That happened that morning. And I think when the court understands that, that in addition to her other conduct, basically the other jurors were astonished. I, I understand the, the position. But I'd like to have you respond to counsel's argument that the admonition of the judge was don't discuss the case. And I read through the record and it looks like to me that's in fact what the judge does. And counsel says there's no evidence, as he sees it, that the juror number seven ever discussed the case. And what do you, how do you respond to that? I, I think I, I respond to that this way. A trial is more than, a trial is more than just the law and the facts. It's the appearance of impartiality. And this goes beyond the pale. I understand, I understand what you're saying is, but the basis of your case is that juror number seven violated the dire, directions of the district judge. And that's how he ruled. And what counsel is saying is, there's no evidence that all she was told to do was don't discuss the case. That is, as, as defendant argues it, you could discuss anything as long as you don't discuss the case, there's no evidence she discussed the case with him. What's your response to that? Your Honor, there is, there is no evidence in this record. We did not talk to the defendant's parents. They were not brought into the chamber, so we do not know to this day what was discussed with the defendant's parents by this juror. The judge did say on page 194 of the transcripts, do not talk with anyone else about the case or about anyone who has anything to do with the case. And I think what the judge- When was that, when was that given? That was at the pre-trial when the jury was, was sworn in. And before the evidence became presented. But it was in court? It was in court, yes, Your Honor, to all the jurors. Okay. Until the trial has ended and you have been discharged by me as jurors. Now, also on page 194, the court goes on to say, and this is not exactly on point with Your Honor's question, but it's, it's sort of on the same lines, that the attorneys may see you in the vicinity of the courthouse, they won't talk to you. That's not because they are unfriendly or because they are discourteous. Rather, it's out of your respect as, for your independence as jurors. And I think what the judge was trying to elicit or trying to educate these jurors was that you must remain above the fray. You must remain impartial throughout the trial. Now, it's also interesting that every other juror understood this. Juror number seven was the only juror that did not understand that. That every other juror understood that you cannot talk to these parties, any party associated with the case during the trial. Just out of curiosity, if a juror had a baseball cap with a particular team emblem on it, and noticed that one of the defendant's people had a baseball cap with the team emblem, and made a point of seeking them out in the courthouse cafeteria and on the elevators and whatnot and talking about the team and their prospects in some game, never said a word about the case. No reassurances, things would be okay, nothing. Just the team. Would that be good reason for dismissal? Frankly, I probably have to say that isolated incident, probably not. I didn't describe isolated, repeated. Oh, repeated incident. Just keep seeking out the defendant's people, talking about the team. And yes, I think it would. I think that would definitely be a subject of inquiry, where the court will then have to do what this court did in this case. The defendant cites the Day case, the Hines case in Parrott v. State of Arkansas about these isolated conversations. This is an affirmative act by the juror. This is an affirmative act by the juror to one side. I had always understood isolated conversations to deal with those awkward moments when you get on the elevator and there's somebody from one side or the other.  And so you take a morning. But in this case, this juror went on the elevator with the defendant's parents when the other jurors held back. She affirmatively got on the elevator with the defendant's parents. So it was just the defendant's parents and that juror alone in that elevator going up in the courthouse. Nobody to this day knows what was said during that conversation. Counsel, what do we do with Mr. Horgan's argument that the reason the jury ratted her out was because she was a reluctant juror and that they would not have ratted her out if she had been cooperating and leaning in their direction? Well, I respectively disagree with Mr. Horgan because, as this court knows in Symington, the impetus of that contact was because that juror was not deliberating, was not, had made up her mind. That was the impetus that started that note in Symington that started the case. But isn't there a danger here? Isn't there a possibility that the reason that the jurors ratted her out was because they didn't like the way things were going in the jury room? No, I think the juror who mentioned that was just speculating on the fact that this juror was so biased towards the defendant's family that it was plainly obvious that she was going to vote no matter what in favor of the defendant's family. It was a spontaneous statement uttered by this juror and it was in no way solicited by the court. You have to understand, the court, the district court in this kind of inquiry is really much in a catch-22 because they have to kind of inquire, but inquire in such a way that they don't inquire too much into the merits of the case. And in this case, the court did its job. It inquired and determined what contacts, affirmative contacts was the defendant, this juror having. Then all of a sudden, this information is blurted out. Well, I don't think that in itself is enough to say, well, okay, we can't do anything. I think that the court can say, listen, he cut off, he did right by cutting off that juror, saying I don't want to hear anything about that, but I find it sufficient on the evidence that exists up to that point that this juror had violated this court's admonition about talking to the family. I agree. I mean, it is putting the district court in a tough position when they have to make these inquiries. But I think this district court did the correct thing, and they did it correctly. They did it the best way they could because they can only go so far, but they can't go too far. There's got to be some communication that's okay. If you try a case in a small town, the jurors and the parties and the attorneys have other contacts, like one of the jurors is a checker at the grocery store at night, and one of the lawyers goes and shops there and winds up at her counter. Maybe she's the only checker. These things happen all the time in small towns. And lawyers do it with judges, too. We run into lawyers that we've been friends with since before we were judges. We talk all the time. We just don't talk about the case. So some kind of contact has to be okay. I think it's okay if it's inadvertent contact. I mean, we can't help that. We can't help. I think what's the difference? I don't know about inadvertent, but suppose that a judge goes to a bar lunch. The bar has a lunch. It's not inadvertent to go there, and it's not inadvertent that the judge comes into contact with the bar at the bar lunch. Well, I think that's a little bit, with all due respect, John, I think that's a little bit different than when a juror in a trial situation. Going to a bar lunch where you know other lawyers who practiced before you are going to be there is a little bit different than in a trial situation where there's a juror and. I agree that it is. Now give me the verbal formula to use to explain what the difference is. Well, the verbal formula is that the trial is a unique circumstance. A trial is a search for the truth, and in order to search for that truth, you need impartial. You need impartial participants, and the impartiality has to be based on not one of the decision makers making affirmative steps to contact one member, one side or the other. The fact that they may be inadvertent contacts with that decision maker is different during a trial, which is a unique search for the truth that we have in our country. And I think it goes to, in this case, it goes to the very heart of what jury trials are about. If the shoes were reversed, I think the defense would be in outrage. If a juror was soliciting the, going to the prosecution's team, walking to the car with the prosecution's agent, I don't think there would be any doubt that that juror was biased. It's really the one-sidedness of it that's the problem, isn't it? Well, I think definitely if the juror was vicarious. When you talk about how unique and search for truth, it's really just rhetoric. I mean, all those things are true, but it's the one-sidedness that's troublesome. No, I respectfully disagree, Your Honor. It's not rhetoric. What it is, it is true. And I'm just saying that we would not be here. Take it you've never seen a jury trial in a small town. Well, I'm in Fresno. I don't know. Compared to San Francisco, that's a small town. I was thinking compared to Nome, Alaska, say. Oh, okay. All right. I mean, people have so many, so much continuing personal contact and knowledge of each other outside the courtroom. I agree, Your Honor, but I don't think you would have in Nome, Alaska, a juror perhaps going up to the prosecutor's, going up to the defense team and talking, during the trial, during the liberations, and talking about it. And it's the one-sidedness that would stop that. Absolutely. I think that is something that's very important. I think the last point I want to say on that is that both sides in a trial, both sides are entitled to a fair trial. And I think this case and this conduct by the juror indicates that, undermines that, Your Honor. The next point I'd like to address is the jury instructions on the willfulness. I think that was adequately set forth in our brief. We felt, and we still feel that the good faith instruction adequately covered the elements in the brief, excuse me, elements on the issue of willfulness. And we would submit on that. And. Before you submit on that, the defendant submitted the jury instruction on willfulness, which contains the error complained of. And the argument appears to be that we're going to get to that because of Burt. But subsequent to Burt was the in-bank case of Perez, which came to a contrary decision. I don't know why under Perez we would reach it. It seems to be waived. Well, Your Honor, I did not argue waiver in my brief. I argued that the standard review was plain error. It wasn't, it wasn't objected to at the time of trial. So I would just submit on that, Your Honor. I objected to it because it was submitted by the defense. It was submitted by the defense. So it's a question of whether or not it's invited error. And we had a case called Burt in which the court got around that. But there's a subsequent in-bank case of Perez that sort of reads that that's cut off. I take it you're not in a position to discuss that. Well, Your Honor, I am not in a position to discuss it. However, I feel that even if this court feels it should reach the issue of willfulness, we think that the good faith instruction adequately covered. That mental element. I was, I understand that argument. I was just taking, trying to get your position on Perez. And I take it you're not in a position to give me that. No, Your Honor. And our last argument, Your Honor, is on the failure of Mr. Rosalyn to testify. And we would submit on our brief on that issue. Why did you confess error? Well, Your Honor, I confessed error because the, the, there was a misreading of 608. And I thought that it would be cleaner to just basically say that I believe technically that he should have been allowed to testify if the judge found that his, if it was a 403. Just get up and testify. That man's a liar. I've known him since his sixth grade. He never told us who he was. And that's why I started my argument with the fact that he had to, the court said it might have been premature to have him testify and that there might have been more of a foundation. But, Your Honor, we felt that if the adequate foundation was laid and the court seemed to feel it was, then the, his testimony would have not, the lack of his testimony, the striking of his testimony did not prejudice the defendant. For the reasons set forth in terms of the fact that Mr. Ahumada did not give testimony unique in this case as opposed to other. I was just curious why, why you confessed error. Thank you. I understand. And with that, Your Honor, no further questions I would submit. Thank you. Thank you, Counsel. Counsel, we ran through your time, but if you want 30 seconds for rebuttal, go ahead and take it. Counsel has argued, Your Honors, that there were no, that the court is focused on the idea that there is a one-sidedness here. Counsel has argued that there were no contacts with the prosecutors, none with the prosecution side. At ER 57 and 65, ER 137, one of the elevator incidents, Juror 7 is talking to the prosecutor. Are you going to keep your back turned on us? That's one where the prosecutor would not answer, just turn his back to her. Nonetheless, it's, it's a, yes, and it's a statement to the prosecutor. Also at 150, ER 57, 65, and 137, Mr. Capozzi states without contradiction and during the hearing in front of the judge, hey, Your Honor, she isn't impartial. She's talking to everybody. She's talking to prosecutors. She's talking to prosecution witnesses, particularly the main investigator, Kent Scute, I think his name is. She's been talking to him. She talks to everybody. There's no denial about that by, by the prosecutor. The prosecutor's attending this. He doesn't, he doesn't contest it. Next, as to the statement that we don't know what was said on the elevator, there's no evidence that there was anything said on the elevator beyond what's in, in this record. And as to this supposed approach to the defense family on the first day of trial, I don't believe that there's anything in the record that shows that's, that that is when that occurred. So the significance of it having happened on the first day of trial is something that the court should not notice. And finally, on the, I, very quickly on the instructional error, Your Honors, I do think the error is plain. The good faith instruction was absolutely no substitute. It, it, it doesn't tell the jurors that they have, that the prosecution has to disprove ignorance of the law, which is, in effect, which is what, what Bartanian's entire defense was. Is this your, the instruction you, the defense proposed? The defense had a willfulness instruction in there, but he never, the, the, the court never had a colloquy where, where he said he resisted, given the appropriate instruction. The court never proposed it for you. I understand that, but what I'm suggesting is that under Perez, we don't get to it. It's, it's, Your Honor, I would just say it's not invited error because it's not, there isn't a strategic giving up or recognition of what the correct instruction would be. There was absolutely no strategic purpose to that. It was plain error. I'm not sure any of our cases say there has to be something strategic. The issue is when the defendant proposes an instruction, which is erroneous, can the defendant then later on in appeal object to it? And under Burt, there was a way around. But the in-bank case of Perez says, no, it's waived. And so what do we do with that? How do you, how would you distinguish Perez? Well, Your Honors, I would just say that it's not a, a case in which defendant and there was nothing precluding the trial court from giving a more expansive definition. There's not a line in Perez on that issue. Well, I'd say, Your Honor, that just under the, it's not an invited error just because it's not, there isn't a conscious recognition by the defense counsel. And that, I mean, I have, I'd like to address that in supplemental briefing at the court. Oh, you've had your chance, and I understand. But it was not cited by the government, Your Honor. Thank you, counsel. United States v. Tartanian is submitted.
judges: Wallace, Kleinfeld, Bybee